

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-26-00005-CR

---

BRANDON KEITH MURRAY, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 8th District Court
Hopkins County, Texas
Trial Court No. 2430465

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

## MEMORANDUM OPINION

Brandon Keith Murray admitted that he stabbed Jimmy Jackson Holmes, Jr. After hearing evidence of that admission, a Hopkins County jury found Murray guilty of murder and sentenced him to imprisonment for life. On appeal, Murray raises two complaints about the trial court's jury charge, which were based on his defensive theory that Holmes was already dead when Murray stabbed him. Murray argues that the jury charge on guilt/innocence (1) contained definitions of "intentionally" and "knowingly" that commented on the weight of the evidence by assuming that Holmes was an individual; and (2) failed to require the jury to determine whether the victim was an individual, meaning "a human being who [wa]s alive"[1] before the murder. Because we find that Murray was not egregiously harmed by any assumed jury charge error and that there was no comment on the weight of the evidence, we affirm the trial court's judgment.

### I.    Standard of Review

"We employ a two-step process in our review of alleged jury-charge error." *Murrieta v. State*, 578 S.W.3d 552, 554 (Tex. App.—Texarkana 2019, no pet.) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994)). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal." *Id.* (quoting *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.)).

"The level of harm necessary to require reversal due to jury charge error is dependent upon whether the appellant properly objected to the error." *Id.* at 555 (citing *Abdnor*, 871 S.W.2d at 732). When, as here, the defendant "did not object to the charge, we will not reverse

---

[1]TEX. PENAL CODE ANN. § 1.07(a)(26) (Supp.).

[the judgment] unless the record shows the error resulted in egregious harm." *Id.* (citing *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005)). "Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Id.* (quoting *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007)). "[T]he record must show that a defendant has suffered actual, rather than merely theoretical, harm from jury instruction error." *Ngo*, 175 S.W.3d at 750 (citing *Dickey v. State*, 22 S.W.3d 490, 492 (Tex. Crim. App. 1999)).

## II.     The Definitions of Intentionally and Knowingly Were Proper

A jury charge must, among other things, distinctly set forth "the law applicable to the case." TEX. CODE CRIM. PROC. ANN. art. 36.14. The State's amended indictment alleged that Murray "intentionally or knowingly cause[d] the death of an individual, namely, JIMMY JACKSON HOLMES, JR., by stabbing him with a knife or a sharp instrument." In his first point of error, Murray argues that the trial court's jury charge deviated from the following statutory definitions of the terms "intentionally" and "knowingly":

> (a)     A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.
>
> (b)     A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

TEX. PENAL CODE ANN. § 6.03(a)–(b).

3

"Intentional murder is a result-of-conduct offense." *Campbell v. State*, 664 S.W.3d 240, 245 (Tex. Crim. App. 2022). Because "the scope of those culpable mental states is limited by the type of offense," the trial court tailored the jury charge to remove references to the nature of conduct. *Id.* (quoting *Cook v. State*, 884 S.W.2d 485, 487 (Tex. Crim. App. 1994)). The trial court's tailored definition from the abstract portion of the jury charge read as follows:

*Intentionally Causing the Death of an Individual*

A person intentionally causes the death of an individual if the person has the conscious objective or desire to cause that death.

*Knowingly Causing the Death of an Individual*

A person knowingly causes the death of an individual if the person is aware that his conduct is reasonably certain to cause that death.

The trial court's definitions of the mens rea element came straight from the TEXAS CRIMINAL PATTERN JURY CHARGES: CRIMES AGAINST PERSONS, § CPJC 80.11, at 37 (STATE BAR OF TEX. 2016). Even so, Murray argues that the trial court's definitions of the terms "intentionally" and "knowingly" combined the statutory definitions of mens rea with the elements of the offense, but that is precisely what the trial court is required to do since the law applicable to the case "consists of the statutory elements of the offense as modified by the indictment's allegations." *Curlee v. State*, 620 S.W.3d 767, 778 (Tex. Crim. App. 2021). For this reason, "[i]n a jury charge, the language in regard to the culpable mental state must be tailored to the conduct elements of the offense." *Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015).

4

We find that the trial court's definitions of "intentionally" and "knowingly" were proper. *See Harmel v. State*, 597 S.W.3d 943, 956 (Tex. App.—Austin 2020, no pet.) (finding no error in the trial court's instruction that "[a] person intentionally causes the death of an individual if the person has the conscious objective or desire to cause that death").

Further, "[a] trial judge improperly comments on the weight of the evidence if he makes a statement that (1) implies approval of the State's argument; (2) indicates any disbelief in the defense position; or (3) diminishes the credibility of the defense's approach to the case." *Nguyen v. State*, 506 S.W.3d 69, 83 (Tex. App.—Texarkana 2016, pet. ref'd) (quoting *Joung Youn Kim v. State*, 331 S.W.3d 156, 160 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (plurality op.)). The trial court's definitions did none of these. Although Murray argues that the trial court implied that Holmes was alive because it used the term "individual" in its definition, the definitions specified that the defendant had to "cause the death" of the individual. As a result, we find no comment on the weight of the evidence, and we overrule Murray's first point of error.

## III. The Lack of a Definition for the Term "Individual" Was Not Egregiously Harmful

Next, Murray argues that the trial court erred by failing to include the definition of the term "individual" so that the jury could be informed that the victim was "a human being who [wa]s alive." *See* TEX. PENAL CODE ANN. § 1.07(26). "[T]he law applicable to the case" "includes . . . statutory definitions that affect the meaning of the elements of the offense." *Ouellette v. State*, 353 S.W.3d 868, 870 (Tex. Crim. App. 2011) (quoting *Villarreal v. State*, 286 S.W.3d 321, 329 (Tex. Crim. App. 2009)). For the purposes of our analysis, we will assume

5

without deciding that the definition of "individual" was law applicable to the case and should have been included in the jury charge.

As a result, we turn to the issue of egregious harm. "In determining whether there has been egregious harm, we consider (a) the jury charge as a whole; (b) the state of the evidence, including contested issues and the weight of probative evidence; (c) arguments of counsel[;] and (d) any other relevant information in the record." *Riley v. State*, 447 S.W.3d 918, 925 (Tex. App.—Texarkana 2014, no pet.) (citing *Sanchez v. State*, 209 S.W.3d 117, 121 (Tex. Crim. App. 2006)).

**A.      The Jury Charge**

Murray argues that he was egregiously harmed because the jury charge dispensed with the requirement that the State prove that Holmes was alive at the time of the stabbing. After reviewing the record, we disagree.

First, the application portion of the jury charge states,

You must determine whether the state has proved, beyond a reasonable doubt, two elements. The elements are that—

1.      the defendant, in Hopkins County, Texas, on or about May 3rd, 2024, caused the death of Jimmy Jackson Holmes, Jr. by stabbing Jimmy Jackson Ho[l]mes, Jr. with

   a.      a knife or

   b.      a sharp instrument; and

2.      the defendant did this either intentionally or knowingly.

Because the application paragraph required the jury to find that Murray caused Holmes's death, it necessarily required the jury to find that Holmes was alive before the stabbing. Likewise, the

6

trial court's definitions of "intentionally" and "knowingly" required the jury to find that the death of an individual was caused by a person, thereby requiring a finding that the individual was alive before the defendant caused the individual's death. Simply put, we see nothing in the trial court's charge that weighs in favor of finding egregious harm.

## B.    The State of the Evidence

Second, the state of the evidence weighs against finding egregious harm. John Arellano, a lieutenant with Hopkins County Emergency Medical Services, testified that he was dispatched to a wellness check to contact Murray on May 2, 2024, and that Murray admitted that he had ingested "pills" like Xanax or oxycodone and "hard wine." Arellano said that he decided to transport Murray to the hospital, but that Murray became "a little erratic," displayed "signs of aggression," and later left the hospital.

Wilma Maynard, Murray's aunt, said that Murray was living with her and her son-in-law, Holmes, who was seventy years old and "very fragile." According to Maynard, Murray returned home around 11 p.m. and "was . . . all over the place," stating that Maynard's grandson, Christian Collins, was trying to kill him. Maynard, who knew Collins had not been to her home in "a couple of months," told Murray that Collins was not there. Murray pointed to Holmes's bedroom door and said, "I mean him," which caused Maynard to respond by telling Murray that Holmes was asleep. According to Maynard, Murray "went in [Holmes's bedroom] and jumped on [Holmes]." Maynard testified that she heard Holmes "go 'Humph,' and that was the only sound he made." Maynard tried to call 9-1-1, but Murray confronted her with a knife and threw the telephone outside. Maynard escaped to a relative's house and was later able to call 9-1-1.

7

Cooper Adams, a deputy with the Hopkins County Sheriff's Office (HCSO), testified that Murray, who had "dried blood on the left side of his face and neck area," indicated that Holmes was deceased and said he did not know if Collins[2] or "Toodeloo"[3] had stabbed Holmes. After Holmes's body and a knife were located, Murray was transported to the HCSO for questioning. No one was found at the home besides Murray and Maynard's nonverbal, disabled granddaughter, who also lived in Maynard's home. Shea Shaw, an investigator with the HCSO, testified that he interviewed Murray, who admitted to stabbing Holmes "four or five times." Stephen Hastings, M.D., a medical examiner for the Southwestern Institute of Forensic Sciences, testified that he conducted Holmes's autopsy, determined that Holmes's death was caused by "sharp force injuries," and classified the manner of Holmes's death as a homicide.

Destinee Morton, a forensic scientist with the biology and DNA section of the Texas Department of Public Safety Crime Laboratory, testified that she analyzed evidence retrieved from the crime scene and from Murray's person. Morton testified that analysis of stains retrieved from Murray's face indicated that Holmes's was a contributor to the blood stain.[4]

Murray argues that, in spite of this evidence, Holmes could have been stabbed by someone else or could have been deceased before the stabbing. As for the possibility of another perpetrator, no one was found in the home at the time officers arrived except for Murray and Maynard's nonverbal, disabled granddaughter. Murray admitted to stabbing Holmes "four or

[2]Adams confirmed that Collins was not at the scene.

[3]Toodeloo was a nickname for Maynard.

[4]Morton added that "the probability of obtaining the mixture profile, if the DNA came from the suspect and the victim, [wa]s 1.93 nonillion times greater than the probability of obtaining the profile, if the DNA came from the suspect and one unrelated, unknown individual."

8

five times," which Hastings testified caused Holmes's death. Further, Maynard testified that she heard a sound from Holmes, indicating that he was alive during the stabbing. Holmes was found to be a contributor to a blood stain on Murray's face that was observed during his arrest and interrogation.

We find that the state of the evidence indicating Murray's guilt was strong and weighs against the finding of egregious harm.

### C. The Arguments of Counsel

At trial, Murray again argued that someone else could have killed Holmes. Murray argued that, although Holmes's blood was found on Murray's face, there was no blood on his upper torso. Murray further opined that Holmes could have already been deceased by arguing the following:

> Now, my conclusion is -- and we saw from the picture there, the diagram that the doctor drew, that if someone stabs someone, stabs, which are puncture wounds or slash -- now, we're having a person that's alive at the time, and blood is pumping through their body. It's not like a dead animal or a deer or something in which an animal is cut. There's no blood flowing at that time.
>
> But someone who is living and blood pumping through their body and being stabbed, I would think that it would just be like almost out of a movie, with blood going everywhere and splashing all over everything. There was blood in the room. There was some around the bed, some around the wall. We didn't have any expert testimony of any kind regarding splatter, but we did see blood in the room and Mr. Holmes was laying in a pool of blood.

Murray also opined that Holmes could have been stabbed by Collins, who could have fled the home before officers arrived. As a result, the jury was informed that, to find Murray guilty, it would have to believe that Holmes was alive at the time of the stabbing, and that Murray was the person who stabbed Holmes to death. The arguments of counsel show that Murray presented his

9

theories to the jury, but the jury rejected them. Accordingly, we do not conclude that the arguments of counsel weigh in favor of finding egregious harm.

We further note that no notes from the jury were returned and that the jury was not polled.

Simply put, nothing shows that Murray suffered any "actual, rather than merely theoretical, harm," much less egregious harm. *See Ngo*, 175 S.W.3d at 750. Consequently, we overrule Murray's last point of error.

## IV. Conclusion

We affirm the trial court's judgment.

<br>

Scott E. Stevens
Chief Justice

Date Submitted:    June 16, 2026
Date Decided:    July 29, 2026

Do Not Publish